Good morning, Your Honors. Eileen Gilbride for the defendants. I will try to save 2 or 3 minutes for rebuttal. Picture this. You're Ms. Hughes. You're at the Hartley doorstep for an unplanned check of the kids' safety. And you're in the middle of utter chaos. Hartley has lied to you about the kids being present. She's slammed the door in your face. She's preventing you from talking to the kids independently. She's screaming at the kids through the door, telling them to lie about Juan Ortiz accessing the house. You know that Ortiz is a domestic abuser who last assaulted one of the kids. There's crying, there's barking, screaming, feces and urine all over the place, moldy food, toxic conditions, an overturned pill bottle, a burning smell. You've called the cops to help you. Well, they're not an emergency line. I mean, if it was such an emergency, why is she not calling 911? Well, there wasn't a crime in progress, but there was an emergency. And so she made the decision to call the cops to get the help to even see if the kids were safe at all. The cops come because you don't know who's in the house. They come, they tell you that Ortiz has an unserved order of protection. That, now, on top of the fact that you hear that Ortiz has been accessing the house because Hartley has told the kids to lie about that. And along with Hartley screaming at you, telling you to leave, telling the kids not to tell you about Ortiz. And things are so chaotic that the cops feel the need to bust the door down to find out if the kids are okay. In the middle of all that. Hartley seems to be the critical element of this case. How much time it would have taken to get a warrant. Because your brief really takes the position that under Arizona law at the time, it could have taken days and possibly as long as a week to get a warrant. But I don't really see you contesting that if a warrant had been available, say, in two to three hours, that you'd be taking the same position. Am I reading that correctly? That would be a different case, yes, Your Honor. That would be a different case. So, but that kind of creates a peculiar situation. So that says that if the state of Arizona creates such a cumbersome and clunky system to get an order for the immediate removal of a child, that then that sort of creates this scenario where you get to break down doors without warrants and seize children. So Arizona by the legislature's, you know, lassitude or creating this odd obstacle can sort of leverage constitutional violations. That doesn't seem like a good set of incentives. Well, that's, I mean, that's not the law anymore. The law was changed in Arizona after this case. But we're rewarding them for having, you know, potentially a constitutionally dubious system. If it creates, if having this law creates the incentives for engaging in this kind of non-traditionally supervised behavior that seriously affects people's rights, that there's something problematic with rewarding Arizona for that. We're not rewarding anybody, Your Honor. We're standing at the position of these case workers on the doorstep of this situation right then, right now, knowing that there's no warrant possibility in the next couple of hours at all. And they're standing there in this chaotic situation. They take out the Rogers case. They read it. And in the middle of that, they're trying to read, they're not doing this, but imagine if they had read the Rogers case. Would it tell them beyond debate that if you remove the kids from this scene, you're either utterly incompetent or a knowing violation of the law? Rogers doesn't tell them that. It doesn't guide them about a known domestic abuser accessing the home. It doesn't guide them what to do when no warrant is available. It doesn't guide them when they're only now facing these horrible, stressful, tense, chaotic, neglectful conditions because the prior planned visits that she had seen in the record were all planned and, you know, clean and hunky-dory. This is not that type of a case. Rogers didn't guide these social workers about any of this. It didn't put the question beyond debate. And that's exactly why the district court erred in ruling that Rogers clearly established the law for this case. And truthfully, that's the only point that I wanted to make in this opening argument, and so I'm happy to take questions. What's your response to their and the district court's reliance on this Lee case? Yes. So in Lee, a motion for pickup was filed with the dependency petition. In none of the Arizona cases was a motion for pickup filed on the day of the incident at the time when they're standing in all of these chaotic conditions. And, in fact, in Lee, the removal was not made until after the dependency petition was filed. And after the motion for pickup, it was about a week later. We're asking in the Rogers case, they're saying, if you can pick up the kids or have a warrant within a number of hours, and the only incidents that you're facing are squalor and bottle rot and malnutrition and things like that, you need to get the warrant within a couple of hours. That wasn't an option here. What is the serious bodily harm that your clients are contending in this case? The conditions were horrendous. Yes. But that's not going to be enough. So is it the return of the gentleman? Correct. Is it the open pill bottle? Correct. Is it the totality of the circumstances? Correct. What is it? It's the totality of the circumstances, especially considering the fact that Ortiz is a known domestic abuser. Hartley is screaming to the kids through the door, don't tell them that he's coming around. So they know he's coming around. They know he's a domestic abuser. And now they know that there's an unserved order of protection, which means that Hartley isn't protecting the kids from this serious risk. Can you imagine what would happen? They're there at 11 o'clock. They leave the kids because they're not sure what to do. Ortiz comes by at 2 or 5 or 9 p.m. or the next day or this weekend, and he abuses or, you know, assaults one of the kids. They're damned if they do and damned if they don't. Rogers did not put this issue. Who's responsible for serving that order? I'm not sure who's responsible for serving that order, but the important point is that Ms. Hughes, when she was at the time on the threshold of this doorstep, she didn't know that Ms. Hartley was confused about who to serve. All she knows is that it wasn't served and that he's coming around and that he's a known domestic abuser, and she's facing this tense, what she calls utter chaos, and she makes a judgment call on what to do. When she can't get a warrant within a number of hours, she knows it's going to be a couple of days. What is she going to do? Is she utterly incompetent or knowingly violating the law when she removes the kids for their safety? I think not. But I have to take you back to Rogers, which is what the district court relied upon. Correct. How is this different? In Rogers, we don't have the domestic abuser. We don't have the uncooperative parent who's trying to prevent the caseworkers from accessing the children, and we don't have the you can obtain a warrant within a couple of hours. We don't have any of that. Well, I have to accept that the district court in Arizona will have a better handle on that last point than certainly I do. The warrant point? Well, no, the inability to get any kind of immediate action out of the Arizona court. I'm not sure. Respectfully, I'm not sure the district court has so much better knowledge than a juvenile court would have. They're completely different things. And all that the district court cited was the Lee case. And in Lee and, frankly, all of the Arizona cases, there never was a motion for pickup before a dependency petition was filed. There was never a motion for pickup on the same day of the incident. There's no evidence and there's no law that says these caseworkers standing on the doorstep of this chaos could wait just a couple hours and get a warrant. They couldn't. Well, that's ‑‑ I hear it. I regularly hear the argument today, and yet I watch courts respond rapidly in lots of contexts. And it's just hard for me to take as a given that the state of Arizona, even with the previous version of the statute, is incapable of responding to what is a dramatic true emergency. Well, remember, back in 2014, you know, you had to file a dependency petition to get an order. And you can't ‑‑ these social workers aren't going to run to the courthouse and file a dependency petition. They've got to get with their team. They have to make the decision along with the family to file an actual dependency. Then they have to get the attorney general to do the paperwork. They switch the facts to something dramatic, and in this case, they catch the mother with a knife to the throat of a child. You're telling me the same thing, is that they're not going to do anything because they can't get the paperwork done in less than a week? No, what I'm telling you is they're going to remove the children, and they're going to sure get qualified immunity for it. They're going to remove the children, just like these caseworkers did in this case. If you have no other questions, I will save the rest of my argument for rebuttal. All right. Thank you. Thank you, Counsel. And we'll hear now from Mr. Bin. Did I pronounce that correctly? Yes, Your Honor. Okay. May it please the Court. Good morning. I'm Martin Bin. This is my partner, Don McDaniel. We heard the defendant's version of this. It's a chaotic situation, but a chaotic situation is not what the standard is in a Ninth Circuit. What we have to show is that this is going to be a significant, imminent, significant injury. We don't have that. We never did. What about the pill bottle that's seen open and exposed and available to the children? Is that causing potential of imminent harm? We don't even know what was in the pill bottle. We don't know if there were any pills. We don't know anything that's safe in a pill bottle for a minor. I'm sorry, I missed you. Are there anything safe in a pill bottle for a minor? I'm not a physician, Your Honor. I don't know. But we don't even know if there were pills there at all. And it's hardly within the house. We concede it may have been dirty. Now, she'd had eight months of dealing with DCS and had no issues. The house is filthy? Maybe, yes. There were issues with the dogs. The dog was a chihuahua dog with puppies. But I think the significance was less the breed of dog than the feces, I think. Well, I mean, it could have been initially there were discussions and it was some pit bull and pit bulls running around. It's not. That's not an issue here. But the issue, I mean, you focus on the issue of imminent harm. Yes. But imminence has to be judged in terms of the choice between alternatives. And so if the question is, if you're considering the alternative of seizing the children, the question is, is there enough of a risk of harm that you can do that as opposed to another alternative whereby you can get judicial supervision of that kind of an action? So their position is that Arizona law did not have a clear mechanism for getting a quick order as the alternative option and that, therefore, lengthens the time span in which imminence is judged. What is your response to that? At that point, we can stretch that forever. They can say the attorneys couldn't file for five months, six months. I mean, it's crazy. I understand. And it would raise, as I said, questions about the wisdom and competence and constitutionality of the substance of Arizona law. But the question remains is can you point us to a statute or rule, a case, a procedure that says that in a situation where there's risk of imminent harm to children, they could have gotten an order from a court within three hours, the sort of concession made in Rogers. They didn't have that. In Arizona, the Child Protective Statutes didn't have any provision like that in them. In 2017, they put that in. However, they have hundreds of lawyers at the Attorney General's Office, a significant number do the DCS cases. Certainly, they could have gotten a hold of one and said, we have an issue. Let's file. These dependency petitions are virtually the same every time. There are a few paragraphs that change, and out they go. This is not some magic that they have to rework. And if there had been an actual emergency, simply going to your lawyers and asking to go to court does not seem out of the realm of possibilities. They just didn't even consider that. This wasn't where they sat back and said, well, it's going to be four hours or four days or four months. Let's take the kids. The reality is Ms. Hughes comes to the door, has an argument with my client, and from there forward things get out of control, only for Ms. Hughes. Ms. Hughes calls her supervisor, calls the police, tells the police she's there to take three kids, which at least from our perspective, the inference that, yes, they made the decision to take the kids on the spot before the police ever got there, which sort of leads me to this Juan Ortiz issue. Juan Ortiz had an order of protection, but there's no evidence that he was going to cause any immediate serious harm to any child. They don't have that evidence. When in deposition, Ms. Hughes was asked, what was the serious risk of imminent harm? And her answer to that was, and that's going to be in. But had he seriously injured Ms. Hartley, I mean, isn't there de facto harm to the children that could be caused if she's immobilized or killed? There's no evidence that he'd ever done that or threatened that. Well, there was enough evidence to get the protective order. She got that. But there was a reason for that. I don't have the order. I haven't seen it. I don't know what it was. In her deposition testimony, she testified he'd never struck her. He had thrown a shoe. And I don't know if it was the children or her, but whatever, but that's what her testimony was, he hadn't struck her. But Ms. Hughes never identified Ortiz and his conduct as a reason, as a problem that placed these children at serious risk of imminent harm. That's on ER 16 and 17 on their statement of facts in paragraph 63 and 64. And she knew the children weren't even home then. She was concerned that those children would be at risk of bodily harm if they came back from the dirty conditions, presence of urine and dog feces on the floor and lice, and access to an open prescription bottle. That's it. That's not the serious imminent physical danger that we're looking for. She does not talk about later they got the order that you say they should have gotten at the time. Well, I'm not sure how much debate or room for debate there is about the conditions. I mean, they got the order. And so as I hear your complaint, it's that they got it, what, six or seven days too late? Well, they got all this is about. No, it's not all this is about. Once there were issues with it that we raised below, we lost on those. But in our position, once there were material misrepresentations in the petition, but set that aside. She couldn't contest it, or she was going to contest this petition. But from her perspective, when they're offered, do you want to go to trial or do you want to get your kids back? Getting your kids back and admitting whatever you have to admit is the easy way to go, and that's what she did. Again, this is ten years ago. But that's what happened. What I think, too, is that the state court did issue the order. Yes. The next week. And if they'd rushed in with a procedure that would have permitted them to do it in two or three hours, how would things have been any different? I don't think they would have gotten it. I mean, they got it a week later. Why wouldn't they have gotten it the day of the event? Different standard than this. And also, when you're looking at these cases here, we've got, again, the emergency removal is the problem. Had they gone through and gotten their order like they did a week later, and they did this before. In 2010, the state issued, got a dependency, but it was an in-home dependency. And the kids stay with mom, and the department comes in and makes sure everything is fine. That's what could have happened. But they'd already removed the children, taken them away from their mother, and they didn't come back for months and months. Yeah, I understand. They got a judge to grant their order within a week. And you're telling us the problem is that they didn't go in on the same day, but I can't see how the judge that granted the order a week later wouldn't have been anything more likely to do it if it was so imminent. I mean, I'm at a loss as to what the actual injury from the delay is. It's not from the delay. It's from the seizure and the way it's done. When the kids are yanked out of the house, taken and separated, that's the injury. It's the, they have a right to be with their mother. If it's a week later and they come in and make a discussion and talk and take the kids, that's one thing. They yanked these kids and chased them through the neighborhood. That's not the way we want our government to act. This is what happened in the case. So what would have been different? They may have followed the process you say they should have followed. A, they may have had an in-home dependency. B, we'll stop there. I don't understand that because the same judge decided at the time to sign off on what had happened. So it's hard for me to speculate that, well, maybe the judge would have decided on something. Fair enough. And so, again, what's the difference? The difference is maybe the difference is after an order there would have been perhaps the ability to challenge it. Was there not an ability? I mean, was she given notice of what happened? The way this works in Arizona is once you have notice, you come in, the order is given, and then you can contest it in a sort of pretrial down the road. This thing doesn't happen very quickly. Your kids are gone and that's it. Had she been able to have some notice, come into court maybe, but it didn't work that way in Arizona. So the difference also is the way the kids are taken. Let's assume that qualified immunity gets denied, gets sent back. Is there anything left? I mean, do you automatically win for summary judgment and this is just a matter of liability? No. I think there's a problem with that. In the underlying ruling, we move for partial summary judgment or partial summary judgment on the 1983 claim. The real issue with that was only this. Was there or were there these circumstances allowing this part of this removal? And that was key to our motion. It's also key to qualified immunity. So in the summary judgment ruling, the court wrote we were granted summary judgment but only on qualified immunity. But then in the clarification wrote the judge considered it from the opposite standpoint, seemingly that the facts were found or viewed in like most favor to plaintiff and the defendant didn't pass muster in trying to get qualified immunity. So if this goes back down, we go to trial. And I don't know how to score those two rulings. I think that's the jurisdictional question. And what I raised was I'm not quite seeing how logically we can have, well, by this we shouldn't be back. It should have come up here in the first place and not have been a factual dispute. We had factual disputes apparently precluding the summary judgment on the motion, but not, I don't know, if not for the qualified immunity. I can't score the two. I think we go back. We litigate the thing. I don't think it's liabilities found. I just don't, I mean, I don't think that's what the ruling is. I think it's not a qualified immunity. It means we go back. I also want to bring up a case, and it's Damory v. Peterson. And it's a 1918 case. But Damory v. Peterson related to an event in 08 and all the law that Peterson, the Ninth Circuit reviewed in Peterson related to the three cases, the May, the Wallace, and Rogers. And we did a complete discussion and review of what the status of the law was in 08, well before our case in 14. And I think that it draws a distinction, the court drew a distinction in qualified immunity between two kinds of cases. The kind where initially when we talk about, for example, an unreasonable search and seizure that violates the Fourth Amendment, that's a different qualified immunity analysis than when we get to something like this. And the court said that we have very specific line of cases culminating in Rogers and May, which identified an applied law clearly establishing that children may not be removed from their homes without a court order or a warrant, absent cogent, fact-focused, reasonable cause to believe that children would be eminently subject to physical injury or physical sexual abuse. And the following quote is prior to the events in question, we have repeatedly held that a family's rights were violated. If the children were removed absent an imminent risk of serious bodily harm, a reasonable social worker would need nothing more to understand that she may not take or remove a child from his or her home on the basis of a situation that does not present this risk. It is not some analysis of whether or not we match with Rogers. It's does this case worker understand what a reasonable case worker has believed, that these children were going to suffer a physical injury, a serious physical injury imminently. And there's really nothing in the record to suggest that the district court got it right. There is no serious physical injury here. The kids were dirty. She hadn't even seen the other four that were out in and about the neighborhood. So I think we get to the point where the district court was correct and should be affirmed. And if there are any other questions, I'd be happy to take them. I thank you for your time. Thank you very much, Counsel. All right. And we will hear a rebuttal from Ms. O'Brien. Thank you, Your Honor. Just a couple of points. Counsel says that Ms. Hartley was in the house and that there were no issues before. That's because there were planned visits before. This was an unplanned visit. He says that there are hundreds of lawyers at the AG's office and that why couldn't we just file something immediately? A, there's no evidence of that in the record. I mean, of course, I guess you could take judicial notice of that, but that doesn't mean you can get a warrant, a court order, within hours of the incident. Maybe you can call up the AG's office and say, hey, can you guys, you know, do up a petition? This was on a Thursday afternoon. Maybe they could do up a petition and get it filed on Friday, even if without a team meeting. But you're not going to get a court order within hours. Ms. Hughes did not tell the cops she was there to take the kids. As she testified, and this is ER 129 and 130, she needed the cops' help to access the kids and to get to see them because Hartley slammed the door in her face and wouldn't let her access the kids to see if they were safe. The method of removal is not an issue here. Notice to Ms. Hartley is not an issue here. None of that is an issue here. She was given a TCN right then and there. She wouldn't take it. The cops made her take it. And the issue here is not the same as the merits on the Fourth Amendment. I'm sure your honors know this. It's whether Rogers gave these caseworkers on the doorstep of this chaotic situation guidance beyond dispute that if they removed the kids then and there, they would be either utterly incompetent or a knowing violation of the law. And it didn't give them that notice. The law in this case was not clearly established. They made a tough judgment call. Rogers didn't guide them. They were not plainly incompetent. They didn't knowingly violate the law, and they're entitled to qualified immunity. We'd ask you to hold so. All right. Thank you, Your Honor. The case just argued will be submitted, and that concludes our calendar for this morning. All rise. Please be seated. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart for this court for this session stands adjourned.
judges: CLIFTON, COLLINS, Rodriguez